I'd like to reserve a few minutes for rebuttal. Do you have a clock that you can see? Yes, I do. In fact, it's already running. Okay. Well, I guess we better start talking. We'll try to help you save your time. All right. May it please the Court, my name is David Krause, and it's a privilege and pleasure to be in Alaska and represent the plaintiffs on this appeal. In this case, Dr. Makin alleges that he suffers from chronic myopathy as a result of taking a drug sold by the defendants. This drug is called Lipitor, and its purpose is to lower damaging cholesterol and thereby help the patient avoid heart problems. Dr. Makin began taking this drug in July of 1999 at the recommendation of his physician, Dr. Krause, no relationship to myself. In October of 1999, Dr. Makin began experiencing fatigue and muscle weakness. He immediately began seeing a series of very highly qualified physicians about his symptoms. Can I stop you there just a second, please? Yes. Dr. Makin also, as I understand reading your record, prescribed Lipitor to his own patients. That's right. He also read all the literature and knew all about the warnings regarding Lipitor. Is that right? I believe that, as stated in our reply brief, he read the statement that comes with the drug. Well, better than that, if he's a physician and he's prescribing the drugs, he had to know or he better know what the drug had as far as side effects or its effects, or why would he prescribe it. I don't think there's any dispute that he was aware of the published side effects in the literature put out by the defendants. And one of those side effects was the issue regarding possible muscle damage. That's right. Okay. But... I just want to make sure I... Yes, you're right about that, Your Honor. But what we think is significant, as pointed out in our reply brief, the literature that accompanied the drugs put out by the defendant says that this is of a transient nature and implies that these symptoms will go away if you stop taking the drug. So our position in the case is, on the merits, is Dr. Macon did not receive a warning of chronic myopathy, which is a permanent damage to the muscles. And that's his claim in the case. And when did he stop taking the drug? Because at some point he stopped taking it whenever the CBK test was... Right. I believe that was November 9, 1999. Okay. So he took it from July until November 9, 1999. And that's consistent with what you're describing as the warning, which is to say it can cause transient muscle problems. He stops taking it at that time, but he's not suing for the transient. He's suing for the permanent. Right. And what I think is significant, Your Honor, is in October, he starts seeing physicians about his symptoms, weakness and fatigue. Of course, on the intake sheets, these physicians see that he is taking Lipitor. And as the record shows, these physicians aren't telling him that these symptoms are caused by Lipitor. The record shows these physicians are struggling to determine his condition. And that's really what the problem here is. Can I stop you there just a second? Sure. Because we know the record. It's true that he has a medical condition. And as a doctor, he took a very aggressive approach on his illness. He saw many physicians. He had the club post situation. He had the prior polio. So his medical course was very good. I mean, he really tried to get down to his problem. However, we're talking about statute of limitations and we're ignoring talking about the Alaska law with regard to what a reasonable person would be on inquiry notice. And it's true that, as you have indicated, that somewhere down the record his doctor said, well, these look like the final diagnoses of what we're going to deal with. But when does the reasonable person inquiry notice kick in under the Alaska law with regard to his claims? In my opinion, it does not kick in until we're within the two-year period preceding the commencement of the suit. No, I understand that. Either that or you'd be out. Tell me when it kicks in factually and why. Our position is it kicks in in March of 2000 when a muscle biopsy determines that the muscle damage is chronic and ties it to the offending drug. Well, claims kick in by then. Does it kick in when he receives that letter from Mayo? Yes, but then we are still within the two-year period. So why are you arguing for March? Well, because, all right, I feel that's when it should be, when you get a definitive diagnosis. But if you argue that it's when he gets the letter from Mayo stating that Lipitor-induced myopathy, that comes at a time when you're within two years from the filing of the lawsuit. So a factual dispute over that doesn't seem material. I think the problem that Judge Bonetti is having is a version of the same problem I'm having, and that is to say the Alaska statute is pretty hard-nosed about this. And it doesn't say as soon as you have a definitive diagnosis it starts to run. It's something earlier than that. How would you characterize Alaska law with respect to something that It's not that you've got a symptom and you know what caused it, and the issue is whether you think it was tortious. Here, he's got a symptom and he has trouble figuring out what's causing it. He's got several competing causes. How does the Alaska statute articulate the standard in that instance? Well, as we know, the Alaska statute says it's two years from the date of approval. Well, I understand that. In interpreting that, the Alaska courts have said that your cause of action accrues when you have a medically documented condition and the circumstances are such that a reasonable man would be put on notice of his potential claim. That's the general standard. As a prescribing physician, is he a reasonable man in that fact that he knows what these conditions may or may not mean, and so the moment he recognizes those symptoms in himself, do you think he would advise his patients the same way? Like, oh, don't worry about it. It's going to go away. Wouldn't he tell his patients, you may suffer permanent damage? Isn't that reasonable to that person, so would it be reasonable to him? I feel that what's important here is what he was being told by the physicians he consulted. Well, that's the back end of it, but it's what a reasonable person would know. If he prescribed this for his patient, his patient came in with the same symptoms, I have all this muscle pain, he would say, oh, don't worry about it. It's going to go away. Wouldn't he have to advise them properly that it could produce permanent damage? If he had that knowledge, he certainly would have an obligation to do that. Well, he's a prescribing doctor. But your contention is that even the description of the medicine, the side effect by Pfizer, don't warn of that possibility. They warn of transient muscle damage but not permanent. And I guess Pfizer would have a chance to show us where in the record they warn of permanent. I can't find it. I'm waiting to hear from you guys, too. But under the reasonable man standard, which is applicable to determining the date of approval, what we have here is a lot of evidence where all kinds of inferences can be drawn. But the bottom line is that the physicians that Dr. Macon was consulting were not able to determine what was the cause of his condition, were not able to tie his condition to Lipitor. And under those circumstances, a reasonable man would not be put on notice of his claim against Lipitor. Now, what the district court did was say, when you have a medically documented condition, the statute of limitations starts to run. What they call, or what the district court called a medically documented condition, was when Dr. Macon reported his symptoms of weakness and fatigue to his physician. That is medically documented, but reporting symptoms is not having a medically documented condition for purposes of the Alaska statute. Let me ask you this. Dr. Gordon has his notes on the chart, and your client says he didn't see that chart until long after that chart was put together. But focus for just a minute on what the chart says. Dr. Gordon, after the November 16th visit, says it's most likely that he had, and that word for a moment puzzled me. It says had rather than has. It is most likely that he had Lipitor-induced, and how do you pronounce that word? Myositis? Myositis. Something like that. I understand it's muscle damage, myositis. Now, what does it mean, what's the word had doing in there? Why isn't it has? Is Dr. Gordon saying, well, I understand that this is a transient condition, and therefore since he's not taking it anymore, it no longer exists? Is that what that had is doing there, that he's relying on the description that it's transient? That's certainly a legitimate interpretation, but that would be for the fact finder rather than for summary judgment. Also important, if you look at Dr. Gordon's, the transcript of his deposition, he says he did not know what was causing Dr. Macon's problems, and he still doesn't know. This was a difficult medical situation, and under the complexity of Dr. Macon's history and the conflicting indications that he was getting from physicians, one said club feet, another said post-polio, another said possibly ALS. Under those circumstances, our contention is, the district court did not properly say that as a matter of law, he was put on notice of his claim against the defendants arising out of the use of Lipitor. Under the interpretations in Alaska, the Palmer case, the quick and dirty is upon notification of an airplane crash, a reasonable person has as a matter of law enough information to be alerted that he should begin an inquiry concerning the potential cause of action against the pilot carrier manufacturer. What's the difference there as far as the inquiry notice to your client after he started experiencing muscle pain? The difference is that what the Alaska court is saying is that up here when a plane crashes, that as a matter of law, everybody knows that it's either pilot error or it's the equipment. And you're on inquiry notice immediately. I don't think that case really applies to our situation. I think that a case that's closer to our situation, where the plaintiff did not know the source of his problem is the Pedersen case. That's the case where the man is in the auto accident, he's rushed to the emergency room, and he comes out of there paralyzed. He thinks legitimately that the cause of his paralysis has something to do with the accident. It's only years later that he discovers that it was due to malpractice in the emergency room. What the court said in that situation, as long as he was looking into his problem on a reasonable basis, the statute of limitations doesn't accrue until he found out the cause. That's stated expressly in the Pedersen decision. That case, I think, is much closer to our situation, where you have somebody making an effort to find out what is wrong with him, but there is a delay in the time between when he starts and when he discovers it. And what's wrong with him might be temporary muscle damage, or what's wrong with him may be permanent muscle damage. And he now is contending that he suffered permanent muscle damage. Right. And when does he know that it's permanent? Well, after a while. I mean, after he's quit taking Lipitor and he has the damage, then it's permanent. How long do we have to wait after he quits taking Lipitor before he can determine, or his doctors can determine, that the permanent state of affairs is due to Lipitor, not the transient state of affairs? Alaska law, in my opinion, doesn't make that task easy. However, as I understand the Pedersen and other cases by the Alaska Supreme Court, as long as you are making a reasonable inquiry into your physical problem, there is not an approval until you have a discovery of what the problem is. In Pedersen's case, if the case was paralysis due to the aorta being clamped off too long during a surgery. In this case, what the doctors thought, well, it might be club feet. It might be post-polio. It might be ALS. And it isn't until later that, after we're within the statutory period, that the diagnosis is made to the point where a reasonable person would say, I need to begin pursuing my claim against the defendants. Isn't your case more like the Johns Heating case, where the toxic substance wasn't really identified as the cause until sometime later, and the Supreme Court said that you go to the fact finder to find out what the reason was? That's another one that we rely on, because these people knew that they didn't feel good. That something was wrong with them. It turned out the symptoms were consistent with carbon monoxide poisoning. They said, we didn't discover that until within the statutory period. And under those circumstances in Johns Heating, the court said, this shouldn't have been decided on a summary judgment, and they remanded it for a factual hearing. Does anybody know how it came out when it went back to the trial court? We tried to find out, and the best I can tell is that the case was finally settled. I'd like to also, I don't see I'm running out of time, Your Honor, but I'd like to also say that it's clear, under the Alaska decisions, and this may be the only thing that I think is clear, is that symptoms are different than a medically documented condition. If you look at both Cameron and Sotko, the man describes his symptoms to the doctor before he receives a diagnosis, and the court approves the statute of limitations at the time of the diagnosis. In this case, the district court triggered the running of the statute of limitations upon Dr. Macon reporting symptoms, muscle weakness and fatigue, in October of 1999, at a time when we were, or he was, a long ways from finding out his medically documented condition. If I may say the rest of the time, we'll give you a chance to respond. Your Honors, may I please report? My name is Mark Shefo, and I, along with my co-counsel, Charles Flynn, represent Pfizer in connection with this lawsuit. Your Honors, Judge Sedgwick correctly concluded, after an extensive review of the record and the applicable Alaska case law, that plaintiffs' tort and loss of consortium claims were barred by the statute of limitations well before Dr. Macon ever filed this lawsuit. Certainly the court is aware the statute of limitations is two years, and where all the elements of a clause of action are immediately apparent, the statute of limitations begins to run at that event. However, there's also a discovery rule, as the court is aware, in Alaska. The Alaska Supreme Court has spoken to the discovery rule, to the inquiry notice provisions, on several occasions, and while Alaska's law has certain aspects which are somewhat unique, it's well established by the Alaska Supreme Court. In Cameron, the court stated that a person reasonably should know of his cause of action when he has sufficient notice to prompt an inquiry into the cause of action. In other words, once an inquiry starts, if the person can reasonably determine all of the elements within two years, the statute accrues at the point of inquiry. Now, at that point, is the person entitled to bring a lawsuit without being subject to a Rule 11 sanction? That is to say, if I don't know, if I'm only inquiring, am I allowed to bring a lawsuit? Well, I think that would be a facts question. As Your Honor is probably aware, in our brief and below, we had argued there was both inquiry notice and actual notice, based on the facts of this case, in October of November. But I guess what I'm asking you is does the Alaska statute start to run at a time before it's appropriate actually to bring a lawsuit? I'd be surprised if that were so. I don't believe it does, Your Honor. I believe that the whole point of it is that something has happened and that the courts have determined it's needed. So in other words, under your reading of the Alaska statute, and I think it's mine, there has to be enough notice that you can bring a good-faith lawsuit. It's not a fishing expedition. It's not in any remote way subject to Rule 11 sanctions for you didn't make proper inquiry. You have to have a cause of action that you can bring a good-faith lawsuit on before that statute starts to run. Is that right? I think that's correct, Your Honor, because I think that's why we have inquiry notice as opposed to actual notice. Once you have actual notice, then at that point you should be bringing a lawsuit. Now, I noticed that the district judge quote at some length from Dr. Gordon's chart notes entered after that November 16th visit, whether on the date of the visit or afterwards, I'm not sure. The district judge did not indicate that Dr. Macon says he didn't see those until a long time afterwards. What am I to make of that? I don't think, Your Honor, with all due respect, we're going to make too much of that because I think that that's contradicted by Dr. Gordon's testimony. What's contradicted by Dr. Gordon? Dr. Gordon basically testifies, and frankly Dr. Macon did too. You'll recall that there was some issue here on the motion to strike certain errata changes to the testimony. Dr. Macon indicated that he had a discussion with Dr. Gordon, and in fact at paragraph, this is well before all this issue arose with statute of limitations, at paragraph 18 of their complaint filed back in 2001, it says, Dr. Macon next saw Dr. Gordon on November 16th, 1999. An interim history was taken. Dr. Gordon's assessment included an opinion that Dr. Macon quote, most likely had Lipitor-induced myositis. As Your Honor correctly pointed out, myositis essentially is just inflammation of the muscle. That's all it means. And then he informed him that Dr. Gordon was going to the Mayo Clinic. So I think we have the undisputed complaint. We have Dr. Gordon's testimony that's in the record, and we have the other. Well, but that complaint, there are two things about that complaint. Number one, it doesn't, it says that Dr. Gordon put it in the chart, which is clearly so. It doesn't say that it was communicated. Nor, and this may be, and I'm figuring this out, actually as I hear the argument this morning, that there may be an important difference here between has and had. That is to say, if the only problem that Dr. Macon was experiencing was transient muscle problems, well, that's one thing. But if it's a permanent muscle damage resulting from taking the drug, that's quite another. And it looks to me as though Dr. Gordon, in his use of the word had, and this is now a week after he's quit taking Lipitor, is treating that as transient. He had it. But that's not what he's complaining about. He's complaining about permanent. Well, Your Honor, and I want to come back to the factual issue if I might, but if you just indulge me for a second. Because I think the Sopko case squarely addresses this issue of permanence. And what Sopko says, and this is a quote, it is irrelevant if the full scope of the inquiry is not known. As the Court is well aware in the Sopko case, the gentleman has an environmental exposure. He goes to the doctor. The doctor says, you have exposure to toxic fumes. Goes back the next day. That's because he has a symptomatology of that. Goes back the next day or week later, the doctor says, you're fine. There's nothing wrong with you. It's five years later that he contracts dementia. The Alaska Supreme Court said the accrual date is not when he found out his permanent diagnosis of dementia. His accrual date is the time when he was first told that he had exposure to toxic fumes and was told by the doctor that, in fact, this was a transient problem that he should expect to go away. Well, but it wasn't so much the doctor. In that case, as I recall, what triggered it is not so much the doctor said you're okay, but he then flies to Seattle. He then gets a lot more information, and then he waits five years. Well, but I think the trigger, when they talk about medically documented condition, they look to the exposure, the toxic fume exposure. Well, but, of course, the condition itself, we all understand, the condition itself doesn't trigger the statute of limitations. What triggers the statute of limitations is you know that you might have a cause of action arising out of the condition. Well, yes, Your Honor, and let me then speak to, because I do believe Sopko addresses the permanence, but even in this case, what we know is that after November 16th, Dr. Makin's inquiry didn't stop. In fact, he then traveled to the Mayo Clinic. Of course. And at the Mayo Clinic, he was asked, and this is all outside of the period, he was asked do you have any particular problems, and he indicated, and that's in the record as well, that he didn't want to take Lipitor because he had prior unpleasant side effects. So November 16th is late in the game, Your Honor. We also have on November 2nd, we have Dr. Levine ordering a CPK test, as Your Honor correctly pointed out. Doctors do that when they suspect there's potential muscle injury or muscle damage. That's what Dr. Levine did. There's a somewhat colorful quote about if you get run over by a horse, you don't look for albinos, zebra, dwarf ponies or something that he has. He basically said there was a muscle problem, so therefore I'm going to order a CPK test. On November 9th, the results of that comes back. What does Dr. Makin do? Dr. Makin immediately that day stops taking Lipitor. And then what does he do? He writes a little fax to his doctors appropriately because he's in contact with them, they're concerned about his health, and he writes, I had a 2,226 level CPK, which is 10 times the upper limit of normal, and I stopped taking Lipitor. And that's what he tells them on that day. Can you help me with what's in the record with respect to the warnings given by Pfizer about muscle damage? I'm hearing from the other side that there's an explicit warning about transient muscle problems, but that there's no explicit warning about permanent muscle damage. What's the truth of that in your view? Well, in my view, Your Honor, I respectfully disagree with my learned colleague. Put my nose in the record, would you please? What's in the record that will help us? In the record at the supplemental record, we had done a supplemental at page 17. The Lipitor label starts at 15. Supplemental record extracts page? 17, Your Honor. 17. Okay. I'm with you. And the print, and I apologize, is admittedly small because it's got shrunk from a larger piece of paper. But in the middle of the second column. Are you telling me that this was a larger piece of paper? This looks like a full-sized piece of paper. You know what? You're right. I've seen it on bigger pictures. This actually, now you said that this is from the PDR, so this is probably the same length. And I stand corrected. In the middle of the second column, it says skeletal muscle. I'm in the second column. I see large print, warning liver dysfunction. Keep going down to the bottom. It says contraindications in bold. See contraindications. And then there's a blur. Skeletal muscle. Skeletal muscle. It says skeletal muscle. And it first talks about rhabdomyolysis, which is a very severe, significant, potential muscle breakdown. And then it says in the second line, it says uncomplicated myology has been reported. And then it goes on and says myopathy, defined as muscle aches or muscle weakness in conjunction with increases in creatine, phosphokinase, which is the CPK we've been talking about, values of up to 10 times the upper limit of normal, which is exactly what Dr. Makin had, should be considered in any patient with diffuse myalgias, muscle tenderness and weakness, again, what Dr. Makin had, and or marked elevation of CPK. Patients should be advised to report promptly unexplained muscle pain. It goes on and it talks about atorvastatin therapy should be discontinued if markedly elevated CPK levels occur or myopathy is diagnosed or expected. So, yes, Your Honor. I'm sorry. No, no, it's okay. I'm with you. And it doesn't say permanent, it doesn't say temporary, it just says what it says. It says what it says, Your Honor. I think myopathy, if one were just to go, frankly, to whether it's Stedman's or Fletcher's or any of these medical dictionaries, it's just disease of the muscle. It's an umbrella term that describes potential muscle damage. And the point here is, you know, we've heard a fair amount that Dr. Makin, no one was suspecting Lipitor or muscle problems at this point. Candidly, I think that's inaccurate. There is a diagnosis on October 20th that's in the record, it's in their complaint, where Dr. Levine does an EMG, which is, again, another type of test. Now, let me ask you this. If Dr. Makin had quit taking Lipitor on November 9th, as he did, and if his muscle problems had disappeared as they had disappeared several years earlier, when he had quit taking the other statin, would he have a lawsuit against you? I think not, right? That is to say, he was warned about it, the symptoms show up, he quits taking it, they disappear. Is that right, that he would not have a lawsuit against you? I think as a defense, Your Honor, we certainly would have issues like the learning intermediary doctrine, warnings, where I think you were referring to. I think, however, if someone basically, if the situation here is you have a long-time prescribing doctor who basically starts taking a drug, otherwise appears to be relatively healthy, a month or two later starts getting it. Otherwise appears to be relatively healthy is part of the problem of his case, because he has these other possible sources that are complicating the diagnosis. That's correct, but they weren't life-limiting. In other words, if you read paragraph 6... He apparently had a permanent limp. He apparently had enough that led the other doctors down the path of this maybe post-polio. I understand they weren't life-limiting, or at least maybe he doesn't bring him in under the ADA, but he had these other problems that complicated the diagnosis. There's no question that because of the symptomatology and the diagnosis, the doctors were looking at other things. I mean, having had the pleasure of speaking with Dr. Makin and taking his deposition, he indicated, and I think the record is clear on this, that he was working 50, 60 hours a week, and he was doing his normal chores, and like I do now, he had a little bit of a problem with his gait, but he was otherwise able to function. Can I stop you there? Of course you can. I don't want to interrupt this, but I want to make sure I understand. As I read the record, though, when he started taking Lipitor, he was not able to perform his duties. And right there, doesn't that produce a cause of action? If I'm taking Lipitor, and I cannot do my rounds, I can't do my duties as a physician, doesn't that put you on inquiry notice? He's a prescribing physician at that point. He takes himself off Lipitor. He then goes to the Mayo Clinic, and they give him this advice. Now, we're getting a distinction here between temporal or temporary sort of things and permanent. Does that have anything to do with being able to file a meritorious cause of action, or does that have to do with the kind of proof and the rest of it goes on? Aren't you on inquiry notice? Isn't that the point? Because there's plenty of stuff happening before the two-year statute ran. But how do we analyze that? Because now we have the record. We've read the warnings by Pfizer. We've got the prescribing doctor, and I ask you the question. If the prescribing doctor saw a patient with the same symptoms that he had, what would he do? Don't worry about it? You might not have a problem. What would a prescribing do? Is that the reasonable person we're looking at?  In fact, there's a few points, Your Honor. I think a prescribing doctor, and there's no question about this, would tell the patient if they had a suspicion to cease taking the drug. That's what doctors know. That's what they do. Lipitor, as Your Honors are well aware, is one of the most prescribed drugs in the world. And so he would stop taking Lipitor. So then the person goes home and everything's happy. Then what? Well, at this point, everything was not happy for Dr. Makin. I think there's a few issues. To address your first question, Your Honor, I think when someone takes a drug, they assume that it's potentially related. I think that's why Judge Sedgwick didn't need to read this. But that's an actual notice inquiry. So in this court, as it evaluates, I believe there was actual notice at that point because he did not only assume he was injured, but he also believed there was a reasonable suspicion for Lipitor. However, Excuse me. Yes, Your Honor. Give me the date and the factual basis for that. Of course, Your Honor. And where it is in the record. I mean, not exactly, but tell me what you're saying. Sure. I can just give you a thumbnail of why I think, you know, what the instructive facts here are. I think we have to look at the Prelip versus Zaria case also tells us when you have a sophisticated person that's a 2000 Alaska Supreme Court, you can take that, actually you should take that into account. Here, Dr. Makin's a board-certified internal medicine doctor, practicing in Alaska since 1986. He's a longtime prescriber of statins, even before Lipitor. He is aware of the warnings and the labeling. He has expertise in musculoskeletal issues. That's on his website, his promotional materials. And at the time, even, of his deposition after the lawsuit was filed, he was prescribing Lipitor to a significant number of his patients. We then have a provocal issue. 1996, he takes another statin. He has muscle pain, weakness, and fatigue. Same types of symptoms. He stops taking it. It lasts for six or seven weeks. He goes off it. He then goes in 1999 to Dr. Kraus. Dr. Kraus, because he has some cardiac issues in his family, says, here, take some prescriptions for Lipitor. Here's some samples. Be careful of the same kinds of things that happen to you when you're on provocal. He then goes and experiences severe muscle pain and weakness. Not just a little pain. This is pain where he says, in his complaint, he has trouble getting in and out of the bathroom. He can't go to work. He can't get out of bed. He starts this inquiry, which is essentially an extensive and intensive inquiry. From October 20th, he sees Levine. Then he sees a foot doctor. He travels to Seattle. He comes back, and with all of this history, on October 20th, he has an abnormal EMG, and Dr. Levine notes, and this is in his complaint again, that there's mild myopathy in the back muscles. Again, myopathy in the back muscles. Page 45 of our brief, we also talk a little bit more about what Dr. Levine noted at that point. I won't take up the court's time with that. Then, on October 21st, Dr. Gordon, who goes to see him, he does an MRI of the neck and spine. 29th, he goes to see Dr. Rabbitt. He travels all the way to Seattle. He's still inquiring. He knows there's something terribly wrong here. He comes back, and he sees Dr. Levine. Again, Levine orders the CPK. The minute he gets back the results, what did he do? He stops. That's on November 9th. He then goes to see Dr. Gordon on November 16th. As we know from the complaint and from our discussion, Your Honor, Dr. Gordon tells him that he has mild myositis. He says, myositis most likely due to Lipitor. Now, that's disputed as to whether he says that. That is to say, the chart notes are there. Dr. Makin says he didn't see that chart until sometime later. And, Your Honor, I think it's disputed if you credit the errata sheet changes. No, it's disputed without the errata sheet changes with respect to whether he saw the chart notes. That is absolutely right, and I misunderstood, Your Honor. That is absolutely true. He says, I saw the letter and the chart notes two years later. What's not disputed, there was a dialogue that he and I had where he said, in sum and substance, didn't Dr. Gordon tell you that you had these issues? And he said, yes, that was one of the causes. You state that correctly. I'm aware of that. And then, again, we're just talking about inquiry notice here at this point. And this is still outside the two-year period. Then, finally, he goes to the Mayo Clinic on the 19th, fills out the form. He has Dr. Kruger's notes indicate that Dr. Kruger indicated to him that he believes that there was an association between Lipitor and the CPK, and Dr. Kruger testified that he advised Dr. Magan. One other thing, Your Honor, and I see I just have a few minutes left. In Plaintiff's brief at 28, page 28, they say, accordingly, based on Palmer, a person is not entitled to wait until the cause of a problem is known before the statute of limitation commences to run. I think that's an accurate statement. However, they then also claim that March 8, 2000, is the date when the statute of limitation should run. And thirdly, in their interrogatory responses at page 4, they say the definitive diagnosis date was March 8, 2000. So when you put all of those things together, essentially what Plaintiff's argument is, you should ignore all of the inquiry notice prior, look only at the date of definitive diagnosis, and that should be the date that you look at. And we respectfully believe, Your Honors, that that's entirely contrary to well-settled Alaska law. Unless the Court has any other questions, thank you very much for your time. Thank you. Your Honor, I submit that the discussion we've had shows that conflicting inferences can be drawn from the record in this case, that when Dr. Macon was on notice for purposes of the statute of limitations cannot be determined on summary judgment. After the fact, after it's determined that he has chronic myopathy, it's easy to go back in the record and find references to Lipitor. The significant point is that the doctors who were examining him at the time were aware that he had been taking Lipitor and were not diagnosing Lipitor-induced chronic myopathy. It seems clear under those circumstances that a reasonable man would not have started a lawsuit against these defendants at the time that the defendants claimed the suit should have been brought. If they are right, then it seems to me that in every case where somebody has a serious problem and there is a drug in the person's history, like in Dr. Macon's case, there's both Lipitor and Vioxx, the lawyer, to protect himself under the statute of limitations, is going to have to sue everybody that possibly could have contributed to the problem. As soon as the problem shows up. Yes. You have to open up a lot of defense files. Alaska Supreme Court has said you don't construe the statute of limitations to obtain absurd or unjust results. We submit that to require Dr. Macon to have started a lawsuit against these defendants based on the information that was available to him at the time would be an abuse of the system, would bring before the court cases that were premature and hence should not have been taking up the court's time. Thank you. Thank you very much. Thank both sides for a very useful, helpful, good argument on both sides. In the case of Macon versus Pfizer is now.
judges: Goodwin, Brunetti, W. Fletcher